IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| JAMES B. STRINGER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | 15-3542-CV-S-REL-SSA |
| NANCY A. BERRYHILL, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff James Stringer seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) failing to consider all impairments, (2) failing to consider the effects of the severe impairments on plaintiff's abilities, (3) relying on his own opinion instead of the doctors' opinions, (4) finding plaintiff not credible, and (5) failing to consider absences from work when assessing plaintiff's residual functional capacity. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

*I.      BACKGROUND*

On March 14, 2013, plaintiff applied for disability benefits alleging that he had been disabled since March 15, 2011, which he later amended to February 16, 2013.

Plaintiff's disability stems from sleep disorders, hemorrhoids, compression fractures, degenerative disc, thoracic spine pinching, a broken left wrist, a broken right forearm, a severed tendon in his left thumb, "muscles in lower back cannot hold vertebrae in place," spasms and pain, "can't control bowels," "legs draw up and cannot feel feet," and throbbing in his thighs (Tr. at 84-85, 89, 236). Plaintiff's application was denied on April 22, 2013. On February 12, 2014, a hearing was held before an Administrative Law Judge. On June 10, 2014, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On October 29, 2015, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The

Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

    Yes = not disabled.
    No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

    No = not disabled.
    Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

    Yes = disabled.
    No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

    No = not disabled.
    Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

    Yes = disabled.
    No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Cathy Hodgson, in addition to documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1984 through 2013, shown in both actual and indexed figures:

| Year | Actual Earnings | Indexed Earnings |
|------|----------------|------------------|
| 1984 | $ 2,158.73 | $ 5,446.85 |
| 1985 | 8,460.64 | 20,475.32 |
| 1986 | 10,224.30 | 24,030.25 |
| 1987 | 9,617.06 | 21,247.97 |
| 1988 | 4,630.19 | 9,749.77 |
| 1989 | 1,870.93 | 3,789.57 |
| 1990 | 4,705.32 | 9,109.82 |
| 1991 | 5,844.99 | 10,909.74 |
| 1992 | 14,904.33 | 26,455.99 |
| 1993 | 16,837.44 | 29,632.52 |
| 1994 | 20,697.31 | 35,473.50 |
| 1995 | 21,658.34 | 35,690.04 |
| 1996 | 24,310.44 | 38,192.52 |
| 1997 | 26,127.34 | 38,783.86 |
| 1998 | 22,380.87 | 31,570.19 |
| 1999 | 24,789.41 | 33,121.83 |
| 2000 | 56,774.80 | 71,883.27 |
| 2001 | 51,985.79 | 64,286.20 |
| 2002 | 40,403.44 | 49,467.24 |
| 2003 | 47,368.69 | 56,611.14 |
| 2004 | 46,822.12 | 53,472.13 |
| 2005 | 47,045.24 | 51,830.45 |
| 2006 | 52,849.60 | 55,666.59 |
| 2007 | 50,525.08 | 50,907.88 |
| 2008 | 52,848.67 | 52,051.68 |

|      |           |           |
|------|-----------|-----------|
| 2009 | 48,893.21 | 48,893.21 |
| 2010 | 32,302.97 | 32,302.97 |
| 2011 | 2,200.00  | 2,200.00  |
| 2012 | 0.00      | 0.00      |
| 2013 | 0.00      | 0.00      |

(Tr. at 199-200).

**Work History Report**

In a Work History Report dated November 26, 2011, plaintiff described his employment (wireman) from 1991 through 2011 as requiring 4 to 6 hours per day of writing, typing or handling small objects, and 7.5 to 8 hours per day of reaching (Tr. at 212-215).

In a second Work History Report, plaintiff stated that when he worked as a wireman from June 1993 through March 2011, he reached for 8 hours per day; he wrote, typed or handled small objects for 8 hours per day; and he frequently lifted 50 pounds or more with 100 pounds or more being the heaviest weight he lifted on the job (Tr. at 228-229, 238).

**Function Report**

In a Function Report dated April 9, 2013, plaintiff stated that he lives in an apartment with family (Tr. at 254-261). Plaintiff sits on average for a half an hour. He has difficulty lifting his right leg to get dressed. His pain increases throughout the day and his legs get progressively weaker. He occasionally falls from standing which he limits to 10 to 15 minutes at a time. He constantly experiences pain and fatigue due to restless sleep.

6

Things that he could do before his "illnesses, injuries or conditions" that he cannot do now include standing, bending, stooping, reaching, writing, lifting, sitting, lying, carrying, walking, running, kneeling and throwing.

Plaintiff prepares his own meals every 2 to 3 days, and he makes things like sandwiches, burgers, eggs, or noodles. It takes him 20 to 30 minutes with breaks. He spends 3 minutes taking out one small grocery bag of trash; he does no other household chores. When he goes out, he is able to drive a car and he goes out alone.

Plaintiff's condition affects his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, use his hands, and get along with others, although earlier in this form he indicated he has no trouble getting along with others.

### B.  *SUMMARY OF MEDICAL RECORDS*

February 16, 2013, is plaintiff's alleged onset date.

On March 12, 2013, plaintiff was seen by a nurse practitioner at the Kitchen Clinic (Tr. at 288). Plaintiff reported smoking one pack of cigarettes per day along with some alcohol use. He said he wanted an MRI of his thoracic spine and left wrist due to history of fracture 15 years earlier. Plaintiff reported continued pain in his mid back and left wrist along with limited range of motion. Plaintiff denied having been to a pain clinic or having had injections to treat this pain. On exam plaintiff's gait was normal, and his range of motion in his legs was normal with no weakness. Curiously, there was no exam of plaintiff's back or upper extremities despite those being the areas of concern to him. Plaintiff was given a referral for an MRI.

7

On March 13, 2013, plaintiff had a colonoscopy performed by Patrick Brooks, M.D., at Mercy Hospital (Tr. at 300-306). When completing the administrative paperwork plaintiff reported a history of "mild" obstructive sleep apnea, injury of the back, and neuropathy. Plaintiff was taking no medication for any condition. After a physical exam, the following was written: "Patient with mild systemic disease with no functional limitations." Plaintiff had 4 small polyps removed and he was diagnosed with hemorrhoids;[1] otherwise, his colonoscopy was normal.

On April 1, 2013, plaintiff had an MRI of his left wrist (Tr. at 313-317). In his administrative paperwork before the procedure, plaintiff reported continuing to smoke and using 10 shots of liquor per week. The MRI showed mild degenerative changes, and an old ulnar fracture.

On April 16, 2013, plaintiff had x-rays of his left wrist (Tr. at 324). Dr. Christine Wester noted no acute fracture, probable old radial and ulnar fractures, and mild degenerative changes.

On June 7, 2013, plaintiff saw a nurse practitioner at the Kitchen Clinic (Tr. at 332-333). Plaintiff said he was pleased with the results of his hemorrhoid removal. "Past 3 months - very tired. Complains of eye drainage. Would like heavy metal poisoning testing - exposed 10 years ago to unknown chemicals. Reports multiple sores on upper arms . . . . Patient believes he is being poisoned with sevens dust[2] or

---

[1] "His prolapsing hemorrhoid symptoms are resolved with hemorrhoid banding." (Tr. at 306).

[2] I assume plaintiff was referring to Sevin Dust, which is a garden insect killer.

arsenic - wants tested." On exam, the nurse noted "no obvious paranoia, however believes he is being poisoned along with other family members." Plaintiff continued to smoke. He reported drinking a pint of alcohol every 1 to 2 weeks. The nurse ordered blood work including poison testing. She also encouraged plaintiff to call the police about his suspicions.

On July 9, 2013, plaintiff saw a nurse practitioner at the Kitchen Clinic for skin issues on the back of his neck (Tr. at 331). Plaintiff continued to smoke. "Feels good - continued left wrist pain." Plaintiff was given a cream for his skin. "Patient believes family member that was poisoning him has stopped - no longer having symptoms."

On October 9, 2013, plaintiff saw a nurse practitioner at the Kitchen Clinic (Tr. at 337). Plaintiff indicated he had not heard from the orthopedic doctor about his wrist so he "has given up." Plaintiff reported no relief from Lidoderm patches or Naproxen (non-steroidal anti-inflammatory) or over-the-counter medications. The nurse assessed lumbar dysfunction and prescribed Flexeril (muscle relaxer).

On January 7, 2014, plaintiff saw a nurse practitioner at the Kitchen Clinic due to sinus pain and drainage (Tr. at 336). He continued to smoke and use alcohol. He was assessed with sinus infection and "smoking abuse."

## C. *SUMMARY OF TESTIMONY*

During the February 12, 2014, hearing, plaintiff testified; and Cathy Hodgson a vocational expert, testified at the request of the ALJ.

**1.     Plaintiff's testimony.**

At the time of the hearing plaintiff was 47 years of age and is currently 50 (Tr. at 27-28).  He is not married and has no children (Tr. at 27).  Plaintiff lives in an apartment with his 69-year-old mother (Tr. at 28).  Plaintiff's mother has diabetes which limits her mobility (Tr. at 28).  Plaintiff had been living with her for about two years (Tr. at 28).  Plaintiff last had medical insurance in 2009 (Tr. at 66-67).

Plaintiff went to school through 12th grade but did not get a diploma (Tr. at 29).  He earned a GED in approximately 1989 (Tr. at 29).  Plaintiff is 5' 9" tall and weighs about 210 pounds (Tr. at 29-30).  Plaintiff's eyesight is not very good, but the last time he had his eyes checked was when he went into the military right out of high school (Tr. at 30).  Plaintiff can do simple arithmetic and he can read and write (Tr. at 29-31).

Plaintiff was arrested for DUI twice in the late 1980s and 1991 (Tr. at 33-34).

Plaintiff uses a computer to check email every day, and he has a Facebook account which he checks about twice a week (Tr. at 31-33).

Plaintiff last worked in 2011 for MTA in Lebanon, Missouri (Tr. at 34, 36).  He worked with computerized robotic things -- he had to crawl inside and in and around machines pulling tubing and wires and reading prints (Tr. at 34).  He was actually a contract laborer there (Tr. at 36).  Before that he worked for Fluidiqs, Inc., doing automation (Tr. at 36).  Plaintiff quit that job because they were getting ready to get rid of him, the job was killing him, and the place he was living was getting bulldozed and there was no way to afford living there (Tr. at 37-38).

Plaintiff had his right forefinger operated on,[3] and it gets locked up and stuck all the time from turning screwdrivers (Tr. at 40-41). Plaintiff was able to work after his finger surgery, but now it prevents him from working because even though it does not hurt, he has to reach over and straighten the finger out which is a "pain in the butt" (Tr. at 41). Plaintiff has not seen a doctor about his finger (Tr. at 42).

Plaintiff's left thumb does not bend as far as it should for gripping, and that is because he sliced the tendon (Tr. at 42). This occurred in 1988 (Tr. at 42). Although he worked after that, now it is really tender and his strength in that thumb is failing (Tr. at 43). Plaintiff also broke his left wrist in about 1990 which limits his rotation and hand strength; but he worked after that occurred (Tr. at 43). These hand problems have caused greater difficulty within the last year -- for example, when he washes a skillet, he has to hold it down in the sink and wash it with his right hand, he cannot hold it with his left hand and wash it with his right hand (Tr. at 57). His abilities have declined about 50% since he last worked in 2011 (Tr. at 59).

Plaintiff has problems with his thoracic spine (Tr. at 43). He has not had any surgeries or any injections, he has not used a TENS unit, and he has not done any physical therapy other than in-home posture exercises (Tr. at 43-44).

Plaintiff suffered a compression fracture at L5 in 1992 (Tr. at 44). It used to be about a 20% loss of vertical height but now the loss is nearing 50% (Tr. at 45). Plaintiff has seen doctors about whether he could have surgery on this, but he was unable to

---

[3]Plaintiff first testified that the surgery was in 1996 or 1997, but then he said the surgery was around 2002 (Tr. at 40-41).

recall any specifics during the hearing (Tr. at 45). During the last year, plaintiff has experienced pain so severe that he was unable to breathe, just from moving wrong to pick up a folding chair (Tr. at 56).

Plaintiff has calcium in his abdominal aorta -- he didn't know he had that until he was sent to a disability doctor (Tr. at 45). Plaintiff believes this is "working in tandem with the squishing on [his] nerves in [his] lower spine that's messing with [his] legs." (Tr. at 46). Plaintiff gets pain in the bottom two-thirds of his thighs (Tr. at 46). Plaintiff has fallen down, the last time about a year earlier (Tr. at 70). He ripped a cabinet door off when he fell, and it caused injury to the middle of his back (Tr. at 70). Plaintiff has been taking Cyclobenzaprine (muscle relaxer) off and on for several months for that (Tr. at 46). When he takes this, it works but it knocks him out (Tr. at 47).

Plaintiff smokes 10 to 12 cigarettes a day (Tr. at 47-48). He used to smoke a pack and a half a day (Tr. at 48).

Plaintiff had a couple drinks two days before the hearing (Tr. at 48). He does not believe he has ever had a problem with drinking and has never undergone treatment for drinking except in 1988 in connection with a DUI (Tr. at 48-49). His medical records from 2013 reflect that he was drinking a pint of alcohol every one to two weeks (Tr. at 51-52). Sometimes he would drink the entire pint in one sitting (Tr. at 53). Lately he has been making two pints last a month (Tr. at 53). Plaintiff last used marijuana 10 to 12 years ago (Tr. at 49).

Plaintiff has a driver's license (Tr. at 50). His license was last suspended due to a DUI in approximately 1990 or 1991 (Tr. at 50). He cooks grits and eggs for breakfast,

12

Case 6:15-cv-03542-REL   Document 28   Filed 02/23/17   Page 12 of 18

he washes dishes by hand, he does laundry, he vacuums about once every three weeks, he goes to the grocery store occasionally, and he helps his mother carry in small sacks of groceries (Tr. at 51).

Plaintiff is supposed to be using a C-PAP but he doesn't because he cannot afford one (Tr. at 52).

Plaintiff can walk about 5 minutes before needing to rest, he can stand 10 to 15 minutes at a time, and he can sit for 10 to 15 minutes (Tr. at 54). Plaintiff can lift a maximum of 10 pounds but he could do that for less than 3 hours out of an 8-hour day (Tr. at 54-55). Plaintiff could not perform a job where he could alternate sitting and standing every 15 minutes because he needs to lie down to get his spine back in order (Tr. at 55). Plaintiff spends 1/4 to 1/3 of the time either reclined or lying down because of pain (Tr. at 55).

**2.     Vocational expert testimony.**

Vocational expert Dr. Cathy Hodgson testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could do light work, climb stairs and ramps occasionally, and never climb ladders or scaffolds. The person could occasionally stoop, kneel, crouch or crawl. He could frequently push and pull, reach in all directions including overhead, handle, perform gross and fine manipulation, and finger. He must avoid concentrated exposure to extreme cold and vibration (Tr. at 63). Dr. Hodgson testified that such a person could not perform plaintiff's past relevant work (Tr. at 63). The person could, however, work as a small product assembler or an office helper (Tr. at 64).

The second hypothetical was the same as the first except the person would be limited to sedentary work and could never kneel, crouch, or crawl (Tr. at 64). Such a person could work as a telephone quotation clerk, DOT 209.587-010, with an SVP of 2 (Tr. at 64). There are 50,000 jobs in the nation and 7,000 in Missouri (Tr. at 65). The person could work as a food and beverage order clerk, DOT 209.567-014, SVP of 2, with 50,000 jobs in the nation and 1,200 in Missouri (Tr. at 65).

The third hypothetical was the same as the second except the person could only occasionally handle or perform gross manipulation and would need two additional 15-minute breaks beyond the normal two breaks and a lunch break (Tr. at 65). Such a person could not work (Tr. at 65). If a person needed to perform work while in a reclined position or lying down, he would be unemployable (Tr. at 66).

## V. **FINDINGS OF THE ALJ**

Administrative Law Judge Victor Horton entered his opinion on June 10, 2014 (Tr. at 11-18). Plaintiff's last insured date was March 31, 2016 (Tr. at 13).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date of February 16, 2013 (Tr. at 13).

Step two. Plaintiff has the following severe impairments: degenerative disc disease, residuals of left wrist fracture, degenerative joint disease, and sleep disorder (Tr. at 14).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14).

Step four. Plaintiff retains the residual functional capacity to perform sedentary work except he can only occasionally climb ramps and stairs but never ladders or scaffolds; he can occasionally stoop; he can never kneel, crouch, or crawl; he can frequently push and pull, reach in all directions including overhead, perform handling/gross manipulation, and perform fingering/fine manipulation. He must avoid concentrated exposure to extreme cold and vibrations (Tr. at 14). With this residual functional capacity, plaintiff is unable to perform any past relevant work (Tr. at 16).

Step five. Plaintiff is capable of performing other work available in significant numbers, such as telephone quotation clerk and food & beverage order clerk (Tr. at 16-17). Therefore plaintiff is not disabled (Tr. at 17).

## *VI. ANALYSIS*

Plaintiff argues that the ALJ erred in (1) failing to consider all impairments, (2) failing to consider the effects of the severe impairments on plaintiff's abilities, (3) relying on his own opinion instead of the doctors' opinions, (4) finding plaintiff not credible, and (5) failing to consider absences from work when assessing plaintiff's residual functional capacity. Plaintiff's arguments are without merit.

Although plaintiff argues that the ALJ failed to consider all of the impairments, plaintiff does not indicate what impairments the ALJ erroneously left out of his analysis.

Plaintiff argues that the ALJ did not consider the effects of plaintiff's impairments on his abilities, but he does not identify any functional limitation or the evidence supporting this functional limitation.

Plaintiff argues that the ALJ failed to rely on "doctors' opinions;" however, there is no medical opinion in the record before the ALJ in this case.

Plaintiff argues that the ALJ erred in finding plaintiff not credible, because almost everyone has a Facebook account and email address. However, that is not the sole basis on which the ALJ made his credibility determination.

Plaintiff argues that the ALJ should have considered absences from work and on that basis he would have found plaintiff disabled. However, there is no evidence in the record to support anticipated work absences.

In discussing his residual functional capacity finding, the ALJ noted that plaintiff's MRI of the left wrist showed only mild or minimal changes, and no treatment provider has ever recommended any treatment for plaintiff's wrist. However, plaintiff's allegations were considered and the ALJ limited plaintiff to no more than frequent handling, gross manipulation, fingering and fine manipulation.

The ALJ considered plaintiff's allegation that he needs a C-PAP, but noted that there is no evidence of that condition in this record. The only evidence of sleep apnea appears in plaintiff's previous disability case where he was shown to be diagnosed with mild sleep apnea, controlled with treatment. The ALJ found that there is no evidence that plaintiff's sleep apnea results in functional limitations.

The ALJ noted that no doctor has offered an opinion regarding plaintiff's limitations, and that the medical evidence in this case is minimal.

A claimant's residual functional capacity is the most he can do despite the combined effect of his credible limitations. 20 C.F.R. §§ 404.1545, 416.945. It is the

claimant's burden to prove his residual functional capacity; and it is the ALJ's responsibility to determine the residual functional capacity based on all relevant evidence in the record, including medical opinions and the claimant's credible statements about his limitations. Hensley v. Colvin, 829 F.3d 926, 931-932 (8th Cir. 2016). The evidence in this record as a whole supports the ALJ's residual functional capacity assessment.

On February 15, 2013, an ALJ entered an order in plaintiff's previous disability case finding plaintiff not disabled. Four weeks later plaintiff filed the instant application. Res judicata bars subsequent applications for disability benefits based on the same facts and issues the Commissioner previously found to be insufficient to prove that the claimant was disabled. Hillier v. Social Sec. Admin., 486 F.3d 359, 364 (8th Cir. 2007). Additionally, medical records created after the ALJ's opinion may only be considered new and material evidence justifying a remand if it is probative of the claimant's condition during the time period assessed by the ALJ and there was good cause for the failure to incorporate the evidence into the record before the ALJ. Rehder v. Apfel, 205 F.3d 1056, 1060 (8th Cir. 2000). "[W]e do not believe that a report . . . completed fourteen months subsequent to the relevant time period constitutes material new evidence warranting a remand of this case." Id.

Here, plaintiff's lengthy arguments rely entirely on medical evidence from his previous disability case, medical evidence predating his alleged onset date by nearly 20 years, and medical evidence that did not exist until well after the ALJ's decision. None

of that material was before the ALJ; none of that material is relevant to the ALJ's decision.

The medical evidence in the case before me does not establish any worsening of plaintiff's condition. Instead, the record as a whole supports the ALJ's finding that plaintiff is capable of performing substantial gainful activity.

## *VII.* *CONCLUSIONS*

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 23, 2017